Michelle R Burrows 861606
MICHELLE R. BURROWS PC
16869 SW 65th Ave. # 367
Lake Oswego, OR 97035
503-241-1955
Michelle.r.burrows@gmail.com
www.oregoncivilrights.com

Rick Glantz
GLANTZ LAW GROUP  LLC
1491 Commercial St. SE
Salem OR 97302
503-581-6333
rick@glantzlawgroup.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Portland Division

| | |
|---|---|
| PETER J. WONG, as the Personal Representative for the Estate of Matthew Wong, PETER J. WONG, an individual, CHRISTINA BULEY, An individual.<br><br>Plaintiff,<br><br>v.<br><br>The State of Oregon, by and through the Oregon State Police, Justin Oxenrider<br><br>Defendants. | No.:<br><br>COMPLAINT<br>4th Amendment of the U.S.<br><br>Constitution: Unreasonable Seizure, Excessive Force; Battery<br><br>42 U.S.C. § 1983<br><br>DEMAND FOR JURY TRIAL |

**INTRODUCTION**

On February 27, 2025, Michael Wong, a mentally ill individual, was shot three times in

the back by Oregon State Trooper Justin Oxenrider as Mr. Wong walked away from the officer.

1 - COMPLAINT

Mr. Wong died from his injuries. This suit is brought for violation of Mr. Wong protected

Constitutional rights under the United States Constitution and Battery as defined by Oregon law.

## JURISDICTION AND VENUE

1.

This Court has jurisdiction over the subject matter arising under the United States

Constitution and pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3)-(4). This Court further

has supplemental jurisdiction over plaintiff's claims arising under state law which derive under a

common nucleus of operative facts such that plaintiff would be expected to try all claims in a

single judicial proceeding pursuant to 28 U.S.C. § 1367.

2.

Venue is proper under 28 U.S.C. § 1391 because the acts giving rise to this lawsuit

occurred in Salem Oregon

3.

Plaintiff timely sent a Notice of Tort Claim to the State of Oregon

4.

Plaintiff is entitled to its attorney fees pursuant to 42 U.S.C. 1988.

## PARTIES

5.

At all material times Matthew Wong was a resident of Marion County, Oregon

6.

The Estate of Matthew Wong was created in Marion County on March 18, 2025 with the

issuance of the Letters of Administration naming Peter J. Wong as the Personal Representative

of the Estate.

7.

At all material times Peter Wong was a resident of Benton County Oregon and is the father of Matthew Wong. At all material times Christina Buley was a resident of Oregon and is the mother of Matthew Wong.

8.

Justin Oxenrider was an Oregon State Trooper at the time of the matters alleged herein.

9.

The State of Oregon, by and through the Oregon State Police, employs Trooper Oxenrider.

**FACTUAL BACKGROUND**

10.

Matthew Wong was 22 years old at time he was shot and killed. He suffered from mental health disorders for which he had received some treatment. He was diagnosed with Major depressive disorder, Post-Traumatic stress disorder and Disorganized schizophrenia. His schizophrenic disorder was differentially diagnosed as a Messiah Complex.

11.

Mr. Wong suffered from thinking disorders and psychosis. His disorder manifested in dissociative, disorganized thinking and paranoid delusions. In his psychotic moments he believed he was a victim of sex trafficking by Jeffrey Epstein and that a young woman he knew had been trafficked for sexual purposes. Mr. Wong wanted to speak with Governor Tina Kotek and would persist until "something was done". Mr. Wong had several encounters with the Oregon State Police which resulted in court orders not to come onto property of the Oregon National Guard Base at 1921 Turner Rd. SE, Salem Or.

12.

3 - COMPLAINT

On March 7, 2024 Mr. Wong visited the Oregon National Guard Base in Salem Oregon. Security staff at the Base were very familiar with Mr. Wong having previously called police to remove Mr. Wong. A Security guard at the base called the Oregon State Police on March 7 to report Mr. Wong's return and refusal to leave, presumably until he spoke with the Governor.

13.

Based on a call from the security guard two Oregon State Troopers responded. Trooper Garrett Hoffman and Trooper Bambrick confronted Mr. Wong in the parking lot of the Base near the security shack. Trooper Hoffman was familiar with Mr. Wong from several previous encounters and according to his reports "I know Wong has been previously trespassed by myself, and other Troopers , on prior contacts".

14.

During the encounter with Troopers Hoffman and Bambrick, Mr. Wong once again articulated his concerns over sex trafficking and demanded to see the Governor. Trooper Hoffman asked Wong if he recalled being trespassed from the property. Mr. Wong responded telling the Troopers he was not leaving until something was done and "if you try to arrest me, I will stab you". Mr. Wong did have a six inch fixed blade kitchen knife which he displayed to the Troopers low and to his side. On none of the previous encounters had Mr. Wong tried to use force against any police officer.

15.

The Troopers ordered Wong to drop the knife who appeared to be moving away from the officers. Hoffman  deployed his taser but the prongs caught on Mr. Wong's baggy clothing neutralizing the effects of the taser. After the first two deployments of the taser Mr. Wong was focused on removing the prongs from his clothing and no longer actively engaged with the

4 - COMPLAINT

Troopers. Mr. Wong was ordered to drop the knife but instead he veered around the Troopers as if to leave with the knife in his hand outstretched to his side. Trooper Bambrick deployed his taser as Mr. Wong was walking away down the driveway. This deployment was partially effective and brought Mr. Wong to the ground.

16.

The officers forced Mr. Wong to his stomach by kicking his feet out from underneath him and kneeing him in the back. Mr. Wong was taken into custody on charges of Trespass 2, menacing, Unlawful use of a Weapon and Resisting Arrest. Wong was indicted on April 2, 2025 for Unlawful Use of a Weapon. He was diverted into the Marion County Mental Health Court to assist with managing his mental health needs. As a consequence, Wong was released from custody. He was given supervised release and ordered not to return to the National Guard Base. Mental Health Court is designed to provide counseling, treatment, medical intervention and Medication management. The Troopers also had the choice to place a two officer hold on Mr. Wong for mental health evaluation and placement. ORS  426.228

17.

On February 27, 2025 Mr. Wong once again trespassed at the National Guard Base in Marion County. The entirety of the time Mr. Wong was at the base is captured in surveillance cameras and bodyworn cameras. Video coverage of what transpired before the shooting was gathered by the Oregon Military Department from two camera views. These cameras are motion sensitive and only record when the threshold for movement is met. In addition to the surveillance cameras a private business across the street from the guard station captured some of the encounter with Mr. Wong; and, ultimately, the Bodyworn Camera from Officer Oxenrider displayed the events just prior to and during the shooting.

5 - COMPLAINT

18.

On February 27, 2025 Mr. Wong was seen walking down the middle of the road from the south "as if he didn't care about the traffic" toward the Base guard shack. Witnesses said that the individual had been seen at the Base at least twice in the last couple of days. The individual stopped at the guard shack and dropped off a note on the flat concrete barrier where the stop sign at the guard shack is located. The individual who was later identified as Mr. Wong then without a word walked to a rock bench located adjacent to the southwest of the guard shack. Video coverage shows Mr. Wong sitting at that bench from approximately 9:54:40 to 10:12 or upon the arrival of Trooper Oxenrider.  Mr. Wong sat on the bench without moving or speaking to anyone.

19.

The note left by Mr. Wong was on two sides of a single piece of notebook paper.

1.  Side one says: "IGNORE AT YOUR OWN PERIL. Demands: Return (my or any) women, children and endhements (sic); Halt all support of Israel; Transfer all local material to HTS or Hezb-allah (sic).

2.  Side Two says: Don't call the cops. Option 1: Surrender. Lay down all arms outside the door. Tell the people inside to put every arm inside a jeep. Drive out. Leave keys in ignition. Option 2: I kill everybody at this base. I'll give you ten mins to decide"

20.

Oregon Military Department Provost Marshal Office posted a poster at the National Guard Base showing a barment date July 30, 2023-October 15, 2023 banning Mr. Wong from the Base.

21.

At the time Mr. Wong approached the Guard Shack on February 27 he had long hair and did not match the photo in the flyer noted in paragraph 18. The RAMS security officer, Mr. Jensen, told police Mr. Wong had left a note about four days earlier which he did not perceive as a threat but more a "rambling". The first note was left in the same manner as the second note but the male had left the scene after leaving the first note and Mr. Jensen made no report about the first note and did not call the police.

22.

Mr. Jensen called the Oregon State Police upon receipt of the second note. Mr. Jensen and his supervisor were in the guard shack when Trooper Oxenrider arrived and "confronted' Mr. Wong. The witnesses in the guard shack observed Mr. Wong and the trooper appear to be arguing and engaging in a verbal exchange. Mr. Wong did not approach the Trooper. Witnesses observed Mr. Wong walking away from the Trooper toward a grassy area with his back toward the Trooper.

23.

Trooper Oxenrider's BWC shows him arriving at 10:09:26. Mr. Wong is sitting quietly on a concrete barrier with his back to the Trooper. The Trooper says "hey partner how you doing". Mr. Wong stands up to face the Trooper and starts to walk away. He does not have any visible weapon and whatever he says to the trooper is inaudible. The Trooper orders Wong to take his hands out of his pocket. The Trooper told Wong he was not to leave "right now" and once again ordered him to take his hands out of his pocket. Wong continues to walk away from the Trooper.

24.

After Mr. Wong pulls his hands out of his pockets he is gripping something in his left hand. Wong walks away from the Trooper who is following aggressively increasing the volume of his voice. With no gesture toward the Trooper by Wong the Trooper simply says "Want to get

7 - COMPLAINT

tased?" Mr. Wong's hands are in the air and he pauses. The Trooper immediately tases Mr. Wong. There was no resistance or threats to the Trooper and, in fact, it appeared Mr. Wong was trying to leave but trying to comply with commands at the same time. The tasing happens 42 seconds into the encounter and while Wong is walking away. There is no recording Trooper Oxenrider confirmed the man who was sitting on the concrete barrier was his suspect.

25.

The BWC records the crackling of the taser for several seconds and during that time Trooper Oxenrider reaches for and grabs Mr. Wong who responds with "fuck". Mr. Wong never touches the Trooper and pulls away from the grip the Trooper had on Wong's jacket. Mr. Wong moves further from the Trooper into the grassy area of the lot. At that point Oxenrider sees the knife and orders Mr. Wong to "put the knife down". Mr. Wong continues to walk away from the Trooper. While Mr. Wong is walking away and approximately 12-15 feet away from the Trooper with his back to the officer Trooper Oxenrider fires three shots in rapid succession into Mr. Wong. The shot is fired at 52 seconds into the encounter. At no time was Mr. Wong pointing the knife at the trooper or even approaching the officer. There is no evidence at all of any activity by Wong that presented any threat to the Trooper.

26.

The officer fires three shots into Mr. Wong's back. Mr. Wong manages to drag himself for about ten feet and drops to the ground. He falls to the ground at 58 seconds into the encounter.

8 - COMPLAINT

27.

Mr. Wong died. The first bullet was shot from an indeterminate range and entered the lateral surface of the right arm. This bullet is believed to have passed through the arm, entered the right chest and exited from the chest. The second bullet was shot from an indeterminate range into the right posterolateral surface of the upper back. This bullet caused injuries to the ribs, lungs, right inferior pulmonary vein, pericardium, heart and aorta. It is believed this is the fatal shot. The third bullet was shot from an indeterminate range into the anterior surface of the left hand. None of the bullets were fired from the front and all were fired as Mr. Wong was calmly and slowly walking away from the officer.

28.

In all the video footage and the eyewitness reports there is no evidence Mr. Wong ever confronted any officer, never assaulted or aggressively approached any office. The officer tased Mr. Wong almost immediately with the only apparent reason noted on the video was that Mr. Wong did not want to stay. Mr. Wong was not presenting a threat and in fact was moving away from the officer. Mr. Wong never said anything to the officer , never threatened him, never cursed and tried at every point to stay away from the officer but did not run away.

29.

At no time did Trooper Oxenrider attempt to engage in any conversation with Mr. Wong, to ask about his purpose or what he was doing. Trooper Oxenrider never told Wong he was a suspect or under arrest. Trooper Oxenrider at every step in the encounter escalated the situation, went hands on first and never attempted any de-escalation. Trooper Oxenrider did not call for backup and it is unknown whether he ran a warrant check on Mr. Wong or knew about Wong's history of

9 - COMPLAINT

mental illness. If the Trooper had spoken with Mr. Wong he would have realized Wong likely suffered from some form of mental illness. Trooper Oxenrider never asked for identification and never spoke with the employees in the guard shack. Trooper Oxenrider never had any cause or justification to tase Mr. Wong or shoot him in the back.

30.

According to dispatch records the information Trooper Oxenrider had at the time he arrived at the National Guard Base was as follows:

1. Male subj at the guard shack at the front

2. Male Subject handed note to reporting party about " I give you ten minutes to decide something about laying down arms".

3. This was the second time the subject has appeared at the location

4. Subject was a WMA Approximately late teens, early 20s, wearing grey sweat pants.

5. No weapons, no backpack

6. Subject came on foot from south along airport Rd.

7. Subject is sitting on a rock bench next to the airplane display

8. Name was Matthew Wong

9. The subject had a knife the last time he appeared at Guard station but no weapons were seen at this time.

31.

Mr. Wong is Chinese American with long black hair. There is nothing in the dispatch records indicating whether Trooper Oxenrider was familiar with Mr. Wong or his mental health history. Mr. Wong's criminal history was easily obtainable by Trooper Oxenrider in his patrol car.

10 - COMPLAINT

## LEGAL STANDARDS
## Constitutional Standards

32.

The Fourth Amendment protects against unwarranted intrusion by the State. *Schmerber v. California*, 384 U.S. 757, 770 (1966).  Searches and seizures conducted in violation of the 4th and 14th Amendment are actionable.  *Monroe v. Pape*, 365 U.S. 167 (1961); U.S. Const. Amend. IV.

33.

A police officer must have probable cause to believe a crime has been committed before arresting or detention.  The officer must "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrants that intrusion." *Terry v. Ohio, 392 U.S.* at 21. A seizure occurs when police objectively manifest an intent to restrain. *California v. Hodari,* 499 U.S. 621, 626 (1991); *Brower v. County of Inyo*, 489 U.S. 593, 596-597 (1989); *Terry v. Ohio,* 392 U.S. 1, 15 (1968), *Michigan v. Chesternut*, 486 U.S. 567, 574 (1988), *cited by Torres v. Madrid*, 141 S. Ct. 989, 992 (2020).

34.

Probable cause under the Oregon Constitution *has both a subjective and an objective component*. An officer must subjectively believe that a crime has been committed and thus that a person or thing is subject to seizure, this belief must be objectively reasonably in the circumstances. The test is not simply what a reasonable officer could have believed when he conducted a warrantless search or seizure, but it is what this officer actually

11 - COMPLAINT

believed, based on the underlying facts of which he was cognizant together with his own training and experience. *State v. Owens*, 302 Or 196, 204, 729 P.2d 524 (1986).

35.

Law enforcement officers are forbidden from the use of "excessive force" in a detention and in an arrest. An evaluation of excessive force is subject to the reasonableness inquiry of the 4th Amendment. "Reasonableness" involves balancing "the nature and quality of the intrusion on the individuals' Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion". *Tennessee v. Garner,* 471 U.S. at 8*, citing to United States v. Place*, 462 U.S. 696, 703 (1983). Reasonableness must be assessed as to when the seizure is made but also how it is made. *Tennessee v. Garner, 471 U.S.* at 8.(*emphasis added*).

36.

Oregon law enforcement relies on the parameters of reasonable force set out in *Graham v. Connor,* 490 U.S. 386 (1989). There is no precise definition of 'reasonableness' but its proper application depends on the facts and circumstances of each particular case including, without limitation, severity of the crime, whether the suspect poses immediate threat or is actively resisting or trying to evade arrest. The use of force must be objectively reasonable based on the totality of facts available to the officer at the time disregarding underlying intent or motive. *Graham v. Connor*, 490 U.S. at 396-397 (citations omitted).

37.

There is a constitutional distinction between non-deadly force and deadly force. A seizure occurs "whenever an officer restrains the freedom of a person to walk away" *Tennessee v. Garner,* 471 U.S. 1, 8 (1985). The use of deadly force is the ultimate "unmatched seizure". *Tennessee* 471 U.S. 1, 9. Deadly force is "force which the actor uses with the purpose of causing, or which the

12 - COMPLAINT

actor should reasonably know creates a substantial risk of causing death or great bodily harm".

*Robinette v. Barnes*, 854 F.2d 900 (6th Cir. 1988).

38.

All use of force requires "objective probable cause", but deadly force requires objective probable

cause that a suspect poses an *immediate threat of serious physical injury to officers or others* to

justify the use of deadly force. *Tennessee v. Garner, supra*. The immediacy of the threat posed

by the suspect is the most important factor. *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793-794

(9th Cir. 2014); *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011). Also relevant to a

reasonableness assessment are the "alternative methods of capturing or subduing a suspect"

available to the officers. *Gonzalez v. City of Anaheim, supra citing to Smith v. City of Hemet*, 394

F.3d 689, 703 (9th Cir. 2005).

39.

The court must consider all of the relevant facts and circumstances leading up to the shooting.

*Young v. City of Providence*, 404 F.3d 4 (1st Cir. 2005); *Billington v. Smith*, 292 F.3d 1177 (9th

Cir. 2002). *Scott v. Henrich*, 39 F.3d 912 (9th Cir. 1994)(must evaluate all circumstantial

evidence to determine if it discredits the officers' testimony). Each officer must adjust and adapt

to the amount of force necessary as the situation evolves. Officers are trained to evaluate

confrontational settings to use force as the facts call for. Officers must employ only the level of

force which is objectively reasonable to gain control of suspects. The use of deadly force must be

reasonable and used only when the officer is faced with imminent and serious threat of death or

serious physical injury. *Tennessee v. Garner*, 471 U.S. 1, 7 (1985).

40.

 The evaluation of the uses of force in a particular encounter has given rise to a variety of approaches including applying the objective reasonableness standard separately to each use of force. What might start out as a reasonable use of force can change if the facts change.

41.

All collective knowledge of all officers is imputed to each other. The Troopers who had contact with, and previously arrested, Mr. Wong had knowledge of Mr. Wong, his mental status and his propensity for non-violence and passive resistance. The knowledge of the other officers is imputed to Trooper Oxenrider who could pull up prior contacts between OSP and Mr. Wong including checking for a warrant  or no trespass orders.

**State Standards**

42.

The Oregon State Police Use of Force policy, mandates that officers may only use physical force when objectively reasonable to prevent harm to the officer or another person, or to make a lawful arrest or prevent an escape. Officers must consider alternatives like de-escalation, use only the necessary degree of force, and are required to document all uses of force. ORS 161.233

43.

Before using force Oregon officers must consider and attempt to use non-force alternatives like verbal de-escalation, waiting or other available resources if it is feasible to do so.

44.

Under Oregon law deadly force may be used when an officer reasonably believes an imminent threat of death or serious bodily injury to themselves or other exists.

14 - COMPLAINT

**FIRST CLAIM FOR RELIEF: Unreasonable Use of Force**
Taser deployment
Defendant Oxenrider

45.

Plaintiff realleges all previous paragraphs as if more fully set forth herein.

46.

The Taser X26 is considered a medium use of force with the potential to be deadly force. The deployment of the Taser requires special training and a certification. The Taser is to be used to rebut force being used or threatened against an officer. It is not appropriate to be used as a compliance tool. The officer must be able to articulate why the taser was deployed, what force or actions were being used by the suspect.

47.

Upon stopping a suspect the officer may only detain a suspect for as long as necessary to assess minimum information and to ascertain whether they have probable cause to further detain. In order to assess the need for detention or further use of force the officer must make a reasonable inquiry and actually engage in investigative work. In this instance Oxenrider did no investigation, made no inquiry into Mr. Wong's motives or his demeanor. Oxendrider issued orders to Mr. Wong to immediately stop telling him he was not leaving. There is no information provided by Oxenrider why he is detaining Mr. Wong.

48.

Assuming Oxenrider knew about the trespass orders and the prior contacts by OSP with Mr. Wong Officer Oxenrider had the right to detain and question Mr. Wong but there is nothing in the exchange evident on the Bodycam footage to show any use of force or even resistance by Mr.

15 - COMPLAINT

Wong. Mr. Wong just simply does not want to speak with the Trooper and attempts to leave. But he does raise his hands and stops to respond to questions. He never approaches Oxenrider, never tries to hit the officer, swing at the officer. Wong does not even curse at the officer. Oxenrider never ordered Wong to leave the property nor ask about the no trespass order. He was never asked if he had a weapon. The use of the taser without any justification is not supported by United States Constitution or state law. Tasers are not to be used to force suspects to comply with commands. That should be accomplished by good police work.

49.

The use of the taser by Oxenrider against Mr. Wong was an excessive use of force which caused pain, anxiety and confusion to Mr. Wong. Mr. Wong was hurt by the taser and it made him panic to get away from the officer. Mr. Wong, despite the tasing, never approached Oxenrider until the Trooper grabbed and used physical force directly against Mr. Wong. Mr. Wong had his hands raised and was not resisting.

50.

As a result of the tasing Mr. Wong was put in fear and suffered emotional trauma which made the last moments of his life painful and full of fear and the knowledge the officer was not trying to protect him but rather to hurt him.

51.

As a result of the tasing Mr. Wong suffered unknown economic damages but non-economic damages in pain, suffering and fear in an amount to be determined at trial.

16 - COMPLAINT

**SECOND CLAIM FOR RELIEF: Unreasonable Use of Deadly Force**
Shooting of Matthew Wong Violation of 4th Amendment
Defendant Oxenrider

52.

Plaintiff realleges all previous paragraphs as if more fully set forth.

53.

The use of deadly force against Matthew Wong violated the 4th Amendment to the United States Constitution, ORS 161.242,  and the Use of force policies of the Oregon State Police. The force used was deployed against a mentally ill suspect who was using absolutely no force or resistance to the officer, was walking away, had not committed any serious crime and presented no reasonable imminent threat to anyone. Mr. Wong had been sitting quietly on a bench for nearly 20 minutes, stood up and walked away from the officer upon first contact. The officer may have had the right to make an inquiry but he had no right to use force.  The officer failed to engage in any investigation or inquiry, tried no de-escalation techniques and within 53 seconds of arrival shot Mr. Wong *three times in the back*. This is a case of shoot first, ask later.

54.

As a result of the actions of Defendant Oxendrider Mr. Wong died after being tased and shot numerous times while trying to peacefully disengage. It is very likely Mr. Wong did not understand or comprehend the situation due to his mental illness which imposes further duties on the officer to engage in a reasonable inquiry and appropriate investigation. Mr. Wong's Estate suffered economic damages to include the costs of burial and loss of economic opportunity. Mr. Wong suffered significant emotional harm including fear, desperation, confusion, and fear.

17 - COMPLAINT

55.

As a direct result of the actions by Trooper Oxenrider the estate suffered economic and non-economic damages in an amount to be determined at trial. Plaintiff also intends to seek punitive damages against the Trooper.

**THIRD CLAIM FOR RELIEF: 14th Amendment Familial Loss Claim**
Defendant Oxenrider

56.

Plaintiff realleges all previous paragraphs as if more fully set forth

57.

The 14th Amendment permits claims brought by individuals with close familial relationships with the decedent to bring their own claims for the loss of companionship and love with the decedent. The family member must be a parent, child or spouse and must have suffered losses due to the interference by a government actor with the close relationships. The interference by the government must be a significant interference. There is nothing more significant that killing one's child.

58.

Mr. Peter Wong and Ms. Christina Buley are the parents of Matthew Wong and suffered the loss of their child, their relationship with their son and the potential for a future relationship with their son. They learned of the death of their son at the hands of the police which made the loss even greater because they knew Matthew was essentially defenseless inside his mental illness. The losses suffered by the parents are catastrophic and include the knowledge they will never see their son again. Ms. Buley and Mr Wong suffer from anger, sadness, depression, grief and fear as a result of the shooting death of their mentally ill son.

18 - COMPLAINT

59.

As a result of the actions by Trooper Oxenrider in tasing, rushing to judgement, failure to investigate and ultimately shooting Matthew Wong in the back three times the parents suffered life long emotional losses, pain, grief and depression. The economic and non-economic losses from the loss of a child, the companionship of that child and the infliction of grief upon the parents will be more fully proven at trial.

**THIRD CLAIM FOR RELIEF: Battery**
Defendant State of Oregon and Oxenrider

60.

Plaintiff realleges all previous matters alleged herein as if more fully set forth.

61.

The actions of Trooper Oxenrider in tasing and shooting Mr. Wong constitute two separate acts of battery. The acts of tasing and shooting were intentional and were intended to cause physical harm to Mr. Wong. Mr. Wong did not consent to either of the acts of battery and neither of them were justified by law.

62

As a result of the unjustified battery committed by Trooper Oxenrider Mr. Wong suffered physical injury causing his death. He endured emotional pain, fear and damage between the time of the tasing and being shot. The actual amount of damages claimed will more specifically proven at trial.

**NEGLIGENT INVESTIGATION**
Defendant State of Oregon

63

Plaintiff realleges all matters previously raised as if more fully set forth.

19 - COMPLAINT

64

Defendant Oxenrider is employed by the State of Oregon by and through the Oregon Department of State Police. He was acting in the course and scope of his employment and in uniform when he used his authority to detain, tase and shoot Mr. Wong. At the time of the tasing and shooting Mr. Wong was being detained by Oxenrider as an alleged suspect in a simple trespass where no other bystanders were present.

65.

Plaintiff Wong's death was caused by the negligence of Trooper Oxenrider and the State of Oregon for the failures related to the investigation and shooting of Mr. Wong, as follows:

1.  In failing to use the proper methods of de-escalation to stop, detain and investigate Mr. Wong.

2.  In failing to conduct a reasonable and appropriate investigation of the stop including asking questions, engaging in a non-confrontational approach, calling for backup, forcing Mr. Wong into a confrontation, escalating the situation at every step without cause or justification.

3.  In failing to assess the danger properly and using more force than was objectively reasonable at each point force was used.

4.  Trooper Oxenrider escalated and accelerated a reasonably calm situation into a shooting within 52 seconds and with almost no information nor any probable cause justifying any actions taken by the Trooper.

5.  Trooper Oxenrider shot a young man walking away from him three times in the back for an alleged trespass without consideration for whether anyone was in imminent danger.

66

As a result of the negligent and sub-standard investigation conducted by Defendants Mr. Wong was shot and killed.

WHEREFORE Plaintiff requests this Court grant judgment as follows:

1. Judgment against Defendants for economic damages in an amount to be proven at trial;

2. Judgment against Defendants for non-economic damages in an amount to be proven at trial;

3. Judgment on the Constitutional claims for punitive damages against Trooper Oxenrider in a fair and reasonable amount to be proven at trial;

4. Judgment against Defendants for deterrence damages in a fair and reasonable amount to be proven at trial; and

5. Judgment for costs, interest, attorney fees and such other and further relief as the Court deems just and equitable.

Dated this 14th day of April 2026

Respectfully submitted,

/s/Michelle R. Burrows
Michelle R. Burrows OSB86160
Of Attorneys for Plaintiff

21 - COMPLAINT